# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **JANE DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.** _2:25-cv-2735-KHV-BGS_ |
| **v.** | ) | |
| | ) | |
| **THE UNIVERSITY OF KANSAS** | ) | **DEMAND FOR JURY TRIAL** |
| **HOSPITAL AUTHORITY;** | ) | |
| **THE UNIVERSITY OF KANSAS** | ) | |
| **HEALTH SYSTEM;** | ) | |
| **THE UNIVERSITY OF KANSAS** | ) | |
| **MEDICAL CENTER;** | ) | |
| **THE UNIVERSITY OF KANSAS** | ) | |
| **POLICE DEPARTMENT;** | ) | |
| | ) | |
| **STEVE STITES, M.D., in his** | ) | |
| **individual and official capacities;** | ) | |
| **AREVALO BRIAN GUTIERREZ, in** | ) | |
| **his individual and official capacities;** | ) | |
| **ZACHARY DYLAN CRONK, in his** | ) | |
| **individual and official capacities;** | ) | |
| **JESSICA WHITE, in her individual** | ) | |
| **and official capacities;** | ) | |
| **JEFFREY A. COWDREY, in his** | ) | |
| **individual and official capacities;** | ) | |
| | ) | |
| **CIERRA DE'AOUN FRANCE, in her** | ) | |
| **individual and official capacities;** | ) | |
| **SARAH ZIMMERMAN, in her** | ) | |
| **individual and official capacities;** | ) | |
| **SAMUEL BRODDLE, in his** | ) | |
| **individual and official capacities;** | ) | |
| **JOHN DOE (identity currently** | ) | |
| **unknown), in his individual and** | ) | |
| **official capacities;** | ) | |
| | ) | |
| **Defendants.** | | |

## INTRODUCTION

This complaint submitted to the court is a civil rights, disability discrimination, and emergency care action arising from Defendants' mishandling of Plaintiff during a postoperative emergency on May 7, 2023, and their subsequent retaliation and obstruction of access to records. Plaintiff underwent major colorectal and urogynecology surgery in April 2023. Eleven days later, while seeking emergency treatment at the University of Kansas Emergency Department, Plaintiff was physically mishandled, and denied stabilizing medical care.

During and after this encounter, Defendants initiated criminal charges against Plaintiff for Indecent Exposure and Trespassing based on allegations that can be contradicted by available video evidence. Defendants discouraged Plaintiff from contesting the charges, threatened harm to her career and reputation, and-despite the absence of supporting evidence-refused to withdraw the charges or conduct a meaningful review. The Wyandotte County District Attorney ultimately declined prosecution, despite Defendant's persistence and recommendation for jail time.

Plaintiff brings this action under the Americans with Disabilities Act, the Rehabilitation Act, the Kansas Act Against Discrimination, EMT ALA, and 42 U.S.C. § 1983 against the University of Kansas Hospital Authority, the University of Kansas Health System, the University of Kansas Medical Center, the University of Kansas Police Department, and their employees and agents (collectively, "Defendants"). Plaintiff seeks compensatory and punitive damages, declaratory and injunctive relief, and all other remedies available at law and equity.

## COMPLAINT

COMES NOW Plaintiff, Jane Doe, appearing pro se, and for her causes of action against the University of Kansas Hospital Authority, the University of Kansas Health System, the University of Kansas Medical Center, the University of Kansas Police Department, and the individual defendants named herein, states as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Jane Doe is an individual residing in Travis County, Texas.

2.    The University of Kansas Hospital Authority ("KUHA") is a body politic and corporate entity created under K.S.A. 76-3301 et seq., functioning as an independent instrumentality of the State of Kansas. KUHA operates the University of Kansas Hospital and related facilities in Kansas City, Kansas.

3.    The University of Kansas Health System ("KUHS") is the operating name of KUHA's network of hospitals and clinics providing healthcare services throughout Kansas.

4.    The University of Kansas Medical Center ("KUMC") is a state educational institution governed by the Kansas Board of Regents pursuant to K.S.A. 76-327. KUMC conducts educational, research, clinical, and law-enforcement operations and employs university police officers under K.S.A. 76-726.

5.    Defendant Steve Stites, M.D., Executive Vice President, Clinical Affairs/ Chief Medical Officer of KUMC, is sued in his official capacity. He exercises executive authority over KUMC's clinical operations and coordination with the University of Kansas Police Department.

6.      The University of Kansas Police Department ("KUPD") operates under KUMC and the
University of Kansas and conducts law-enforcement activities on KUHA-operated
property pursuant to K.S.A. 76-726.

7.      The Officer Defendants-Arevalo Brian Gutierrez, Zachary Dylan Cronk, Jessica White,
and Jeffrey A. Cowdrey were sworn University Police Officers employed by KUMC at
all relevant times, acting under color of state law and within the scope of their
employment.

8.      The ER Nursing Defendants-Cierra De'aoun France, Sarah Zimmerman, Samuel Broddie,
and John Doe were nurses or nurse assistants employed in the KUHA/KUHS emergency
department in Kansas City, Kansas. Each participated directly in the events described
herein and acted under color of state law and within the scope of employment.

9.      Defendant John Doe is designated by a fictitious name because his identity is presently
unknown. Plaintiff will amend this complaint when his name is ascertained.

10.     All individual defendants acted under color of state law and within the course and scope
of employment with entities created, controlled, or operated by the State of Kansas.

11.     This action arises under the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.),
the Rehabilitation Act (29 U.S.C. § 794), the Kansas Act Against Discrimination (K.S.A.
44-1001 et seq.), EMTALA (42 U.S.C. § 1395dd), and 42 U.S.C. § 1983.

12.     Federal-question jurisdiction exists under 28 U.S.C. § 1331.

13.     Supplemental jurisdiction over related state-law claims exists under 28 U.S.C. § 1367(a)
because those claims form part of the same case or controversy.

14.  Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside or work in this District and the events giving rise to the claims occurred here.

15.  Plaintiff designates *Kansas City, Kansas* as the place of trial.

## STATEMENT OF FACTS

### A. BACKGROUND

16.  On August 31, 2012, plaintiff was established as a patient with the University of Kansas Health System (KUHS).

17.  Between April 17, 2019 and May 7, 2023, Plaintiff received treatment from multiple departments within the KU Health System. During this period, Plaintiff transitioned all of her medical care to KU, including Primary Care, and became a patient of numerous departments and clinical disciplines as she was continually referred to additional specialties for complex medical needs.

18.  After imaging and diagnostic testing revealed advanced intussusception, prolapse, cystocele with rectocele, and displacement of internal organs due to the advanced stage of the disease, Plaintiff underwent major surgery at KUMC on April 26, 2023. The procedure was performed jointly by Dr. John Ashcraft (Colorectal Oncology) and Dr. Melissa Huggins (Urogynecology).

### B. EMERGENCY DEPARTMENT VISIT

19.  Following surgery, Plaintiff recovered at an Airbnb location and on May 7, 2023, developed severe postoperative abdominal pain, dehydration, inability to have a bowel movement, and faintness. Plaintiff was transported by ambulance to KUMC Emergency Department (KUMC-ED).

20.     Nurse's notes document that "*Per EMS pt was found in the shower in an AirBnb with severe abdominal pain.*"

21.     Before transport, paramedics placed a large sleep shirt on Plaintiff, but she remained otherwise unclothed.

22.     Plaintiff arrived by ambulance at KU Hospital around 11:45pm seeking medical assistance for complications related to recent surgery

23.     Upon Plaintiff's arrival, Nurse France told the paramedics, "She's a regular. Dump her."

23.     Plaintiff's two prior visits to the Emergency Department occured on 09/24/2021 and

10/05/2022.

24.     At the direction of Nurse France, Plaintiff was dumped off the backboard and onto the floor of the emergency department waiting area, causing additional injury.

25.     Plaintiff's exposed condition was visible to other individuals in the waiting room.

26.     After Plaintiff landed on the floor, Defendants France and Broddle repeatedly instructed her to stand up, without assistance, and sit in a hard-surfaced wheelchair.

27.     Plaintiff informed them she was physically unable to stand or ambulate without support due to her medical condition and fall-risk status.

28.     Plaintiff repeatedly stated she had recently undergone major surgery at KUMC, was experiencing complications including rectal impaction, had not sat fully upright since surgery due to pain, and required assisted ambulation.

29.     While Plaintiff remained on the floor, emergency department staff contacted KUMC-PD and reported that Plaintiff was being uncooperative and requested assistance.

30.    Body-worn camera footage shows another EMS unit arriving shortly after Plaintiff was dumped on the floor and left exposed. The arriving patient—an older male—was gently assisted off a cart and into a wheelchair. Staff positioned him directly in front of the location where Plaintiff remained exposed, and video shows him reacting to her exposed condition. Staff then provided the male patient a blanket, which he placed over his head.

31.    Body-worn camera footage shows Officer Cronk and Nurse Broddle assisting Plaintiff in standing from the floor and transferring to a recliner requested by police officers. Plaintiff's body remained exposed until police suggested to staff that coverage be provided.

32.    During the transfer from the floor to the recliner, Plaintiff's lower body and genitals remained completely exposed to surrounding patients, visitors, and staff.

33.    ED staff and KUMC-PD then moved the recliner, with Plaintiff lying on it, into the front hallway near the restroom and the KUMC Security/Police rooms.

34.    While in this hallway, staff assisted Plaintiff in standing from the recliner and putting on pants while in a public setting, in view of other patients, visitors, and staff who were not involved in Plaintiff's care.

35.    During this process, staff handled Plaintiff in a manner that caused her pain and contributed to additional injury.

36.    An unidentified ED staff member ("John Doe") struck Plaintiff in the abdomen in the area of her recent surgery, causing her to lose consciousness.

37.    When Plaintiff regained consciousness, she was back in the ED waiting room on the recliner, covered with blankets and experiencing severe pain. Police officers were standing beside her and remained present until she was sent home.

38.     Body cam video shows Plaintiff disoriented and confused.

## C. RETALIATION CONDUCT

39.     Plaintiff requested assistance using the restroom but was repeatedly denied; staff insisted she ambulate without a walking aid or support.

40.     ED staff again contacted KUPD, and reported that Plaintiff was walking around without pants on.

41.     A third KUPD-MC employee, Officer White, arrived and remained for the duration of events.

42.     Nurse Broddle documented in Plaintiff's permanent medical record, "Police called. Patient is walking around waiting room without pants on," which was false information.

43.     Body-worn camera video shows Broddle telling officers he did not personally see Plaintiff engage in the alleged behavior, stating, "*Oh I didn't see it. She is the one that saw it,*" while pointing to France.

44.     The medical record entry claiming Plaintiff was "*walking around the waiting room without pants on*" was based solely on France's report. No staff member or witness corroborated it.

45.     Officers nonetheless initiated criminal action against Plaintiff without confirming whether any element of the offense occurred. The timing—shortly after Plaintiff objected to mistreatment and requested fall-risk assistance—demonstrates retaliatory motivation.

46.     Plaintiff was subjected to custodial control by KUMC-PD officers without reasonable suspicion, corroborated evidence, medical assessment, or probable cause. Officers relied

solely on France's uncorroborated statements while ignoring exculpatory video and staff comments.

47.    Plaintiff was repeatedly denied assistance to the restroom despite her documented fallrisk status, forcing her to perform multiple painful digital disimpactions to relieve postoperative bowel obstruction—an intervention that required medical assessment and treatment. Plaintiff's requests for help during these episodes were ignored or denied, and her repeated reminders that she could not squat, bend, or strain under her surgeon's orders were repeatedly disregarded.

48.    On body cam video, Plaintiff can be seen medically compromised and unable to arrange her own transportation upon her request to leave. Officers can be seen and heard discussing the possibility of taking Plaintiff to jail, but collectively agreeing that "they won't take her" due to her obvious medical condition.

49.    Officers used a KUMC "cab voucher" to pay for and arrange for Plaintiff's ride back to the AirBnB residence.

50.    Body cam video shows Officer Gutierrez and White looking up Plaintiff's address and viewing her AirBnB address. Officer White stated that it was a "nice house". Officer Gutierrez responded, "Let's go egg it," showing retaliatory intent.

51.    Plaintiff was accused and cited for criminal trespass and indecent exposure and referred for prosecution without lawful basis or supporting evidence.

52.    Plaintiff returned home in pain and in a suicidal state.

53.    On May 8, 2023, around 10:30 a.m., Plaintiff failed to appear for a virtual session with Dr. Kragenbrink, a KUMC pain psychologist whom Plaintiff saw weekly.

54. Medical records show that Nurse Susan Barelli, at Dr. Kragenbrink's direction, requested that a second EMS unit be dispatched to Plaintiff's Airbnb for a welfare check. Plaintiff was transported to St. Luke's Hospital (SLH) less than 12 hours after KUMC-PD sent her home.

55. SLH records show staff contacted KUMC regarding Plaintiff's prior ED visit. KUMC staff told SLH that Plaintiff was a liar and provided false information about her condition. SLH records show staff documented that Plaintiff "lied to multiple staff members," based on statements from KUMC personnel. SLH used this false information to determine
    Plaintiff's care plan

56. SLH treated Plaintiff and released her in stable condition.

## D. AFTERMATH AND DEFENDANT'S RESPONSE

57. The following week, Plaintiff saw her KUHS primary care physician Dr. Sharissa Mabry and her surgeon Dr. Ashcraft, who documented Plaintiff's account and observed injuries. Dr. Ashcraft marked in red on diagrams the injuries at specific suture sites corresponding to where Plaintiff was struck by the unidentified John Doe employee.

58. When Plaintiff contacted KUMC, she was directed to Patient Experience Specialist Suzanne Lane-Tanner for further assistance. Plaintiff was initially told she could contact KUPD/Security to view video footage allegedly showing her behavior. She was then directed to Captain William Mahoney, who also told her she could view footage after he completed his investigation.

59.    Mahoney later informed Plaintiff he did not see Plaintiff exposing herself or "walking around without pants on" in the video, but he would not drop the charges due to a "*notolerance policy*" and because he "*wasn't there*." He also stated Plaintiff would not be allowed to view the video, despite earlier assurances. Plaintiff was later told that it was their policy to not ever drop charges instigated by employees.

60.    Both Mahoney and Lane-Tanner told Plaintiff she would need to appear in court for the charges to be dismissed, stating, "*Just show up to court, explain what happened, and I am sure the charges will be dismissed*." Plaintiff stated she would not discuss intimate medical information in open court.

61.    Lane-Tanner pressured Plaintiff to appear in court, telling her, "*This could end your teaching career*," and that the allegation could place her on the sex-offender registry.

62.    On May 23, 2023, Lane-Tanner wrote a letter apologizing for the conduct of ED staff and KUPD and again directed Plaintiff to contact KUPD regarding having the charges dropped.

63.    Plaintiff requested all medical records relating to May 7–8. KUHA provided only vitals and nurse notes and ignored Plaintiff's request for video. Dr. Kragenbrink also requested video for therapeutic review; the request was denied.

64.    On May 30, 2023, Plaintiff submitted a medical record correction request challenging the note stating she was "walking around the waiting room without pants on," asking KUMC to verify the statement using video. Plaintiff wrote, "*I do not believe this is true and can be easily verified using video from security cameras. Please just check the cameras! This is ruining my life!*"

65.    KUHS never processed the correction request. On October 20, 2025, Plaintiff emailed

KUHS Privacy Services requesting all prior amendment requests. On November 25, 2025, KUHS Manager of Privacy Christina Chrisjohn stated the May 30 request was never acted on because it "was routed to the wrong in-basket." This answer was received over two years after the original request.

66. On June 12, 2023, Plaintiff replied to Lane-Tanner's letter, expressing frustration over conflicting information and refusal to review evidence. Lane-Tanner responded only to direct Plaintiff to Medical Records; she did not communicate further.

67. Plaintiff attempted repeatedly to contact Mahoney; her calls were refused or unreturned.

68. Plaintiff later discovered multiple medical notes describing behaviors she had no memory of. Nurse Zimmerman documented "Pt continues to slide off the recliner and lie face first on floor," and recorded triage information Plaintiff does not recall receiving. Triage notes include conflicting data, including blood pressure 126/104, indicating medical distress that was not addressed. Records also indicate an ECG Plaintiff does not recall.

69. On June 21, 2023, Plaintiff contacted KUMC HIPAA Compliance Officer Christina Hogan-Newgren, explaining concerns that she may have lost consciousness before triage, or that triage was falsified. Plaintiff requested that Hogan-Newgren review video. Hogan-Newgren agreed to look into the matter.

70. On June 23, 2023, Hogan-Newgren emailed Plaintiff stating she had not viewed any video and that Plaintiff's request was outside her purview.

71. Later that day, Plaintiff went to KUMC seeking to speak to Mahoney. Officers initially refused contact. When Mahoney arrived, he told Plaintiff, "You have to leave." When Plaintiff stated she believed she lost consciousness and staff were covering it up, Mahoney responded, "Yes and it has to be adjudicated. You can't be here."

72.     Plaintiff attempted to engage KUHA's legal department and was told no such department

        existed. During a later follow-up, a KUMC physician gave Plaintiff the number for the

        Risk and Claims Department. When Plaintiff called, staff said, "I'm sorry. I can't speak

        to you," and disconnected.

73.     During the week before Plaintiff's court date, Defendants or their representatives

        contacted the Wyandotte County Prosecutor's Office and recommended jail time, despite

        allegations contradicted by available evidence.

74.     On June 26, 2023, Plaintiff appeared in Wyandotte County court and pled Not Guilty to

        indecent exposure. She requested a public defender, delaying the case for months.

75.     Approximately a month later, concerned about employment consequences, Plaintiff

        elected to proceed pro se and requested discovery.

76.     In August 2023, after receiving discovery, the Wyandotte County Prosecutor's Office

        provided it to Plaintiff and informed her the case would be nolle prossed.

**E. RESULTING HARM**

77.     Plaintiff continues to suffer physical pain, psychological trauma, humiliation, and

        symptoms of post-traumatic stress disorder (PTSD) as a direct result of Defendants'

        conduct. She also experiences worsened postoperative complications, distrust of medical

        providers, long-term emotional and physical harm, and damage to her reputation.

**F. TOLLING OF LIMITATIONS**

78.     The KUMC-ED visit occurred on May 7-8, 2023. The criminal case for Indecent

        Exposure was disposed in August, 2023. Plaintiff's falsified medical records of this

        incident have been forwarded to numerous other healthcare professionals who have used

that information to inform healthcare decisions. Plaintiff's official medical records remain uncorrected and prejudicial.

79.  Plaintiff's claims are timely under the doctrines of equitable tolling, delayed discovery, and fraudulent concealment. The statute of limitations should be tolled based on Defendants' conduct and Plaintiff's medical and life circumstances that made timely filing impossible.

80.  Defendants withheld, refused access to, and misrepresented the contents of video evidence showing the events at issue. Plaintiff made repeated requests to view the video footage, including through KUMC-PD, KUHS Patient Relations, KUHS Privacy Services, KUHA Risk and Claims, and the KUMC HIPAA Compliance Officer, but Defendants repeatedly blocked her from reviewing it and refused to review it internally. Defendants' refusal to release critical evidence prevented Plaintiff from discovering the full extent of the wrongdoing and from timely preparing her claims.

81.  Defendants also provided contradictory information, assured Plaintiff that charges would be dismissed if she simply "showed up to court," while simultaneously recommending jail time to prosecutors. Defendants repeatedly redirected Plaintiff between departments while refusing to answer questions or return communications. These actions misled Plaintiff, obstructed her ability to understand her legal position, and delayed discovery of key facts.

82.  Several KUMC staff, departments, and police personnel intentionally misrepresented Plaintiff's conduct, communicated false statements to outside providers, and documented triage and medical actions that Plaintiff does not recall and that video evidence may contradict. Defendants' active concealment, misinformation, and refusal to verify their

own records through available video constitute fraudulent concealment sufficient to toll any limitations period.

83.     In addition to Defendants' obstructive conduct, Plaintiff's ability to file suit was severely impaired by extraordinary medical and life circumstances arising partly from the events of May 7–8, 2023. These include:

    a.   loss of housing resulting in homelessness;

    b.   loss of income and financial instability that caused inability to obtain basic needs, including food;

    c.   loss of access to consistent medical care;

    d.   deterioration of mental health, including chronic PTSD, severe psychological trauma, and episodes of suicidality;

    e.   multiple surgeries; development of severe sepsis requiring life-saving surgical intervention; extended hospital stays; months of home nursing visits and

    f.   permanent disability

84.     Plaintiff acted diligently whenever she was physically and mentally able, repeatedly contacting KUHS, KUMC-PD, Patient Relations, Privacy Services, and Risk and Claims to obtain records, correct false entries, and request access to the withheld video evidence. Despite her diligence, Defendants' refusal to provide access to material facts and Plaintiff's intervening life-threatening medical crises made timely filing impossible.

85.     Due to above circumstances, Plaintiff could not reasonably have filed suit earlier, and the limitations period do not begin to run until Plaintiffs are able to obtain sufficient information to recognize the full scope of injury and the misconduct supporting claims, which, to date, Plaintiff is still being denied.

## <u>CAUSES OF ACTION</u>

**Count I - Violation of the Americans with Disabilities Act (42 U.S.C. § 12132)**

86.    Plaintiff incorporates all prior paragraphs.

87.    KUHA, KUHS, and KUMC are public entities subject to Title II of the ADA.

88.    Plaintiff has disabilities and had significant postoperative physical limitations, documented fall-risk conditions, and a mental-health history known to KUMC providers.

89.    Defendants denied Plaintiff reasonable accommodations, including assistance with mobility, safe restroom access, stabilizing treatment, and appropriate triage.

90.    Defendants discriminated against Plaintiff based on disability and/or perceived disability.

91.    Wherefore, Defendants are liable for violating Title II of the ADA.

**Count II - Violation of the Rehabilitation Act (29 U.S.C. § 794)**

92.    KUHA, KUHS, and KUMC receive federal financial assistance and are subject to Section

504 of the Rehabilitation Act.

93.    Plaintiff was denied equal access, emergency care, and mobility assistance required for her disabilities.

94.    Defendants denied Plaintiff reasonable accommodations, including assistance with mobility, safe restroom access, stabilizing treatment, and appropriate triage.

95.    Defendants discriminated against Plaintiff based on disability and/or perceived disability.

96.    Wherefore, Defendants are liable for violating Title II of the ADA.

**Count II - Violation of the Rehabilitation Act (29 U.S.C. § 794)**

97.    KUHA, KUHS, and KUMC receive federal financial assistance and are subject to Section

       504 of the Rehabilitation Act.

98.    Plaintiff was denied equal access, emergency care, and mobility assistance required for

       her disabilities.

99.    Defendants' conduct-including refusal of care and disability-based

       assumptionsconstitutes disparate treatment.

100.   Wherefore, Defendants are liable for violating Section 504 of the Rehabilitation Act.

**Count IV - EMTALA Violations (42 U.S.C. § 1395dd)**

101.   Plaintiff arrived at KUMC-ED seeking emergency care and was entitled to an appropriate

       medical screening and stabilizing treatment.

102.   Defendants failed to conduct legitimate screening, fabricated triage entries, ignored signs

       of medical distress-including blood pressure of 126/104-and released Plaintiff without

       stabilization.

103.   Wherefore, Defendants are liable for violating EMTALA.

**Count V - Conspiracy and Obstruction (42 U.S.C. § 1983; federal law)**

104.   After the incident, Plaintiff submitted records requests through KUMC's designated

       process, as instructed by its employees, under KORA and HIPAA. KUHA and KUPD

       delayed, restricted, or produced incomplete records.

105.    KUHA personnel, including the Patient Advocate, discouraged Plaintiff from challenging the false allegations and attempted to deter her from asserting her rights.

106.    Upon information and belief, KUHA and KUPD coordinated communications with the prosecutor, including recommendations for jail time, which was inconsistent with available evidence.

107.    These actions constitute a coordinated effort to conceal material evidence and obstruct Plaintiffs ability to pursue claims under federal law.

108.    Wherefore, Defendants are liable for conspiracy and obstruction of access to records.

**Count VI - Falsification of Medical Records (K.S.A. 21-5824; K.A.R. 100-24-1; 18 U.S.C. § 1519)**

109.    KUHA and KUHS staff, acting jointly with KUPD, created or inserted false statements into Plaintiffs medical record, including fabricated descriptions used to justify withholding care and involving police.

110.    Such conduct violates K.S.A. 21-5824, which prohibits making false written instruments with intent to defraud or mislead. These acts constitute unprofessional conduct under K.A.R. 100-24-1, which forbids falsifying, altering, or destroying medical records.

111.    Defendants further violated 18 U.S.C. § 1519 by falsifying records with intent to influence or impede matters within federal jurisdiction, including ADA, Rehabilitation Act, EMTALA, and §1983 proceedings.

112.    Wherefore, Defendants are liable for falsification of medical records. Such conduct violates Kansas criminal law, Kansas medical-licensure regulations, and federal obstruction statutes.

**Count VII - § 1983 - Retaliation, Due Process Violations, and Conspiracy** 113.

The individual defendants acted under color of state law.

114.    Defendants deprived Plaintiff of federally protected rights by fabricating allegations, issuing false citations, obstructing record access, and coordinating with prosecutors to reinforce unfounded charges.

115.    Wherefore, Defendants are liable for acting jointly and in concert, constituting a civil conspiracy.

**Count VIII - Continuing Harm and Deliberate Indifference**

116.    Defendants exhibited deliberate indifference to Plaintiffs health and safety.

117.    Defendants' actions and omissions constitute deliberate indifference under the Fourteenth Amendment and ongoing violations causing continuing harm.

118.    Plaintiff continues to suffer physical injury, emotional trauma, PTSD, and long-term medical complications.

119.    Wherefore, Plaintiff seeks declaratory and injunctive relief to prevent further harm, as well as compensatory damages for the harm already sustained.

## DAMAGES

120.    Plaintiff incorporates all preceding paragraphs as if fully stated herein.

121.  Defendants herein discriminated against Plaintiff on the basis of her disabilities with malice and reckless indifference as to the legally protected rights of the Plaintiff.

122.  As a direct and proximate result of Defendants' actions, Plaintiff has suffered professional harm, reputational harm, monetary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, among other non-monetary damages.

123.  While contesting the Indecent Exposure charge, Plaintiff was required to travel repeatedly between Kansas City, Kansas and her state of residence throughout a multimonth surgical recovery period. Her surgeon advised limiting travel and restricting other activities, yet these trips were necessary, causing significant physical pain and financial loss.

124.  Plaintiff continues to experience anxiety, depression, and post-traumatic stress symptoms requiring ongoing care.

125.  Defendants' conduct has undermined Plaintiffs access to medical treatment, damaged her reputation, and eroded trust in healthcare institutions.

126.  Defendants' actions were willful, wanton, malicious, and reckless, entitling Plaintiff to compensatory and punitive damages, as well as declaratory relief establishing the illegality of Defendants' conduct, injunctive relief preventing further violations of Plaintiff's rights, and any additional relief the Court deems just and proper.


WHEREFORE, Plaintiff prays the Court enter judgment in her favor against Defendant on all Counts of her Complaint.

Respectfully Submitted,

/s/ *Jane Doe*

Jane Doe, Pro Se Plaintiff
Email: dltbgyd.ku.lawsuit@gmail.com
Ph: (512) 649-8723
3575 Far West Blvd.
P.O. Box 26362
Austin, TX 78755