## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KAREN OVERSTREET, | ) | Defendants. |
| | ) | Case No. 2:25-cv-02735-KHV-BGS |
| Plaintiff, | ) | |
| | ) | |
| v.        ) | | DEMAND FOR JURY TRIAL |
| | ) | |
| THE UNIVERSITY OF KANSAS | ) | |
| HOSPITAL AUTHORITY; ) THE | | |
| UNIVERSITY OF KANSAS ) | | |
| HEALTH SYSTEM; | ) | |
| THE UNIVERSITY OF KANSAS | ) | |
| MEDICAL CENTER; | ) | |
| THE UNIVERSITY OF KANSAS | ) | |
| POLICE DEPARTMENT; | ) | |
| | ) | |
| STEVE STITES, M.D., in his individual | | |
| ) and official capacities;      ) | | |
| AREVALO BRIAN GUTIERREZ, in his ) | | |
| individual and official capacities; ) | | |
| ZACHARY DYLAN CRONK, in his ) | | |
| individual and official capacities; ) | | |
| JESSICA WHITE, in her individual and ) | | |
| official capacities;      ) | | |
| JEFFREY A. COWDREY, in his ) | | |
| individual and official capacities; ) | | |
| WILLIAM J. MAHONEY, in his ) | | |
| individual and official capacities; ) | | |
| | ) | |
| CIERRA DE'AOUN FRANCE, in her ) | | |
| individual and official capacities; ) | | |
| SARAH ZIMMERMAN, in her      ) | | |
| individual and official capacities;      ) | | |
| SAMUEL BRODDLE, in his individual | | |
|        ) and official capacities;      ) | | |
| JOHN DOE (identity currently      ) | | |
| unknown), in his individual and official | | |
|        ) capacities; | | |

## RESPONSE TO REPORT AND RECOMMENDATION

## FOR DISMISSAL OF COMPLAINT AND REQUEST TO APPEAL DENIAL OF COUNSEL

Request to Appeal Denial of Counsel

It is hard to answer one without the other because they are so closely tied together in my objections. It feels like the court is tying my hands and denying me of my right to seek answers about a medical event that has been denied to me by the KUHA and their affiliates. In the first motion, the court states that I am being denied request for counsel for a variety of reasons, but one reason provided is that you are recommending dismissal, thus no need for counsel. Then, in the recommendation to dismiss, the court lists many reasons for dismissal that could be easily remedied with an amended complaint written with adequate legal guidance, something I currently do not possess. It creates a paradox impossible to untwine. The court is basing its decision to deny counsel on the basis of it's recommendation to dismiss, yet the very problem of not having counsel is what causes the inadequacy of the complaint. Denying my request for counsel and then dismissing my complaint due to objections that could be rectified with adequate counsel creates circular logic that seems impossible to escape.

During this past year I have been recovering from the multiple surgeries required to save my life due to the abdominal sepsis that occurred during the later months of 2024. I felt stymied by my inability to contact even more potential lawyers without dissolving into tears and being unable to communicate, something that has happened before. I felt inadequate to petition the court on my own due to lack of knowledge of the law and how the federal court system operates. I tried to make myself more knowledgeable, but I was and still am out of my depth.

It seemed one of my biggest barriers was understanding how to communicate with the court in a way that is acceptable. This has been the hardest. I turned to using AI technology, ChatGPT, to help me understand things I could not. But as the court has admitted, this case is complex and it proved too much. Ultimately, I ended up using ChatGPT to write the very complaint that the court possesses. I fact checked it for accuracy, particularly with the Statement of Facts, but ultimately, that was all I could do with me having no education or experience in the law.

This court's brutal list of objections shows the inadequacy of using ChatGPT as my legal counsel. As much as I tried to fully explain the situation, it's complexity and too hard to believe circumstances make it impossible to adequately present to the court in the manner that is expected. I have had to balance what the court might rule as too lengthy with how to

make it succinct, while still retaining the most important facts. I have attempted to determine, apparently unsuccessfully, which important aspect of the evidence I possess that I should present to the court now or later. I don't have the knowledge or experience necessary to determine this and evidently ChatGPT doesn't either. For this reason, I beg the court to reconsider its decision to grant counsel.

There are other factors that should weigh heavily in favor of granting counsel. If my understanding is correct (and yes I was forced to use ChatGPT for legal guidance on this), the court has discretion to request counsel for anyone unable to afford it, but uses 4 factors to consider this decision: (1) the plaintiff's financial ability to pay for counsel; (2) the plaintiff's diligence in attempting to secure counsel; (3) the merits of the plaintiff's claims; and (4) the plaintiff's capacity to present the case without counsel. The court admits factors 1 and 2 are satisfied, but asserts factors 3 and 4 have not been met.

The third weighs the merits of my claims. The court points to the contemporaneously issued Report and Recommendation (R&R) recommending dismissal under Rule 8 as evidence of insufficient "merit." But the R&R is not a final adjudication; it is subject to de novo review by the district judge upon timely objections, which I was not provided the opportunity to present before judgement was made. The court states that "The decision whether to appoint counsel 'is left to the sound discretion of the district court'." The soundness of the court's discretion in rushing towards a denial of counsel is faulty logic. Since the court is using its contemporaneous R&R to dismiss as justification to deny counsel, it does not make sense to deny counsel until that issue is settled first.

Your most recent rulings and recommendation are complicated and lengthy. I tried calling the clerk's office to asked them to clarify your ruling and asked how to respond. Should I rewrite the complaint? Should I submit to the court the litany of evidence I possess now so that they have enough information to not dismiss or save for later? How do I submit the evidence? I found out the process to submit the video evidence and asked if there was a deadline for submission. They could not answer any of these questions and only directed me to get legal counsel.

I beg the court to reconsider its decision to request counsel on my behalf, even on a limited basis. This is not a frivolous lawsuit and could have dire consequences for future patients seeking the same type of emergent. If this is a regular practice of KU then others will have the same thing happen to them as what happened to me. The court should feel obligated to protect the public, at large, by allowing this complaint to move forward.

RESPONSE TO REPORT AND RECOMMENDATION FOR DISMISSAL OF COMPLAINT

I am unsure if I can completely respond to the court's recommendation after using the short time granted by the court for a response, but this is my best effort to clarify my complaint and address the court's concern. It took me many months using ChatGPT to compile my original complaint in a succinct complain using the correct format that I thought was required by law. I do not have the time to attempt to structure this response use proper court language and format. I beg the court to accept my response in the format, as presented, and either allow my complaint to continue to grant me time to amend my complaint to address the court's concerns.

To bring clarity to the situation, I can only share what I can in an outlined format. Please forgive me for not having time to edit and correct this reply for any errors.

I.    Relevant Facts Prior to the Event

I have a long history of complicated GI diseases since childhood. In 2018, a surgeon not associated with KU performed surgery on my rectum bowels and rectum. The short story is I sought help for rectal prolapse, but because I couldn't get the prolapse to present itself in front of the doctor, I as misdiagnosed with only 4th degree hemorrhoids. During the procedure, the surgeon discovered that I did have rectal prolapse and performed a repair. I subsequently had severe complications and was referred to a specialized pelvic floor physical therapy practice, who in turn quickly connected me with the specialists in the Gyn department at KU. My surgeon retired only a few months after my surgery and was no longer available for consult. In approximately early 2021, the gyn department at KU attempted to send a referral for to the colorectal surgery department within the KU system, but someone who has control over referrals received in their department wouldn't accept the referral and refused to grant me an appointment.

I was eventually referred to the Gastrointestinal department who also attempted to refer me to the Colorectal Surgeons. That referral was also refused. I have medical records from that time period where the GI practitioner wrote that they only I would be treated for the continued prolapse I was experiencing was to present to the ED when it happens.

When the prolapse occurred again, I followed the GI practitioner's instructions I went to the Emergency Room Department of KU on [date]. At this encounter, I was given a mental health screening. After the screening, I was immediately led to a restroom where I was instructed to remove all of my clothing and dress in a bright, yellow gown. All of my clothing and belongings were taken away. During this process, I kept asking "Why? What is going on?" and the nurse ignored me and refused to speak to me or give me any information. I was desperate to be seen so I followed her instructions. She then led me to one of the patient bays where about 12 other patients were also dressed in bright yellow gowns and

yellow socks and there was an employee sitting with them all, obviously in a supervisory position. I was told to sit with the group and was refused any explanation when asked why.

I quickly realized I had been marked for psychiatric care. I sat and cried silently. After about 20 minutes, the same nurse nurse came back apologized and said that she had made a mistake. She led me back to the restroom, returned all my clothes and gave me permission to continue waiting for a doctor in the hallways of the patient treatment area because I was so visibly upset and couldn't stop crying. After my phone was returned to me, I called the the doctor on call that had instructed me to go to the ER. I told him what happened and explained that I couldn't stop crying. I wanted to leave.  He told me that they normally do not prescribe emergency meds, but he made an exception. He sent in a prescription and I left without being seen (LWBS).

I relayed this event to Dr. Kragenbrink, who communicated with the psychiatric department about what transpired. I was scared to go to the ER again. They decided that the screening was not properly administered, resulting in the incident. There was an agreement put in place that the ER personnel were no longer allowed to administer the mental health screening if I came for future ER visits. The agreement was that someone from the psychiatric department would be called down to administer the screening instead.

Simultaneous to this, I was still being refused a consult to the colorectal department. In my medical records from [date], the GI practioner Alison Johnstone wrote: [quote].

When the prolapse did occur again, I presented myself to KU's ED again. I was not given the mental health screening at all. But my wait was over seven hours. Again, I called the doctor on call and relayed the information. He sent me home without being seen.

This event seemed to quickly lead to a consult with colorectal doctors department. Extensive tests were ordered and it was discovered that I had advanced rectal intusseption. I was told that my colon was detaching itself from my body and as that happened, my rectum was trying to slide out of my body and in the process pulling down other organs and displacing them, causing the intense abdominal pain that I had been experiencing. Surgery was ordered.

The surgery was performed on April 26, 2023 at KU Hospital by Dr. John Ashcraft from the Colorectal Department and Dr. Wiggins from the Gyn Department. They repaired a collapsed cavity wall, and pulled my collapsed colon back up into position and surgically reattached it to my tailbone. I had incisions going up and down my abdomen as well as stitches in the rectal area. I was told the recovery would take many months to heal. I was put on strict restrictions that were to last for weeks and months. I was told not to strain for bowel movements. I was told not to squat or bend over. I was sent to my Airbnb residence with a walker and cane to help with mobility, where I was to recuperate until after my first

post-surgery appointment and was released to travel back to my new residence in Austin, Texas.

During my first week staying alone, I began experiencing complications with constipation, which was significant for the type of surgery that was performed. I communicated extensively with the surgeon's nurse from KU who instructed me on thing to improve the situation. The last conversation I had with her was on two days before the Event in the ED on May 7th and 8th. She told me to take even more laxatives and drink more water and try to make it until my post-op appointment scheduled for Tuesday, May 9, 2023.

By Sunday, May 7, 2023, my condition worsened to the point that emergency services were call around 11:30pm.

The two previous ED events described are the only times I visited KU ED during the almost year and a half preceeding this event.

II.    Event

I don't feel it necessary to go into too much more details about what happened after I was taken to the ED by ambulance, but to provide clarity, the following occurred:

- I was initially misidentified as a frequent visitor. This was incorrect, but  was a discrimatory reason to deny me the same treatment as anyone else who walks through their doors. (i.e. France instructing staff to dump me on the floor upon arrival).
- I was treated as a behavior problem, a histrionic, instead of someone in need of emergent medical care. I do have documented mental illness diagnosises of PTSD, depression, and anxiety, but have no history of behavioral issues.  The staff possessed knowledge of this information, as well as information from the last two ED visits mentioned in this previous report. The used my mental health history as an excuse to deny me emergent medical care.
- It was assumed that I was "on drugs". On the bodycam video I possess, Nurse Brodie is seen on camera telling Officer Cronk, "She's on drugs. She just needs to leave."  I was not on any substance and have no history of substance abuse. A drug screen was performed at the 2nd ER less than 12 hours after leaving KU and it shows that I had no alcohol or illegal substances in my system. Regardless, no one should

be denied medical care based on an assumed drug disorder, whether it is true or not. This is a discriminatory practice.

- The most alarming fact is that I had an undocumented, unconscious episode while I was in their care. I remember being hit in the stomach by a male employee in a effort to try to force me into a sitting position. I now know that this is what caused me to lose consciousness. KU holds the video of this incident and is refusing to release it to me, or use it for review internally to correct the falsified medical records. I remember waking up in the waiting room in severe pain. I thought I had been there for hours and had just fallen asleep.

- On the segmented video clips of body cam that I was provided through discovery, you can observe me in a complete state of medical crisis.  You will see me ask repeatedly for help and being denied. When I was in the restroom, I harassed to get out and sit down in the waiting room. I asked Nurse France to send someone to help me and was ignored. She rolled her eyes and walked away. It is on video. You can see on video on confused and having memory issues. I was unable to even unlock my own using a code that I had used to years and was a combination of my street and house number, where I had lived for over 20 years.

- Much the body cam that was provided to me doesn't have me in it. Much of body cam recordings  are of the police officers conducting their shoddy investigation into whether they could substantiate charges for indecent exposure. They are seen asking staff, who claim they didn't see it, including Nurse Brodie. This is significant because when KU police officers asked Brodie if he wanted to press charges for indecent exposure, he said yes because I was "uncoorperative".  This is a discriminatory reason to charge someone with a crime that there is no discernable proof of them committing at the time the event occurred.

- Officers White and Guiterrez can be seen discussing how what to do with me after I was unable to unlock my phone to order a ride. Before they decided to use a cab voucher, these officers are seen on video discussing whether to take me to jail and deciding that "they won't take her" due to my apparent medical condition.


III.    The Second ER Visit

The most important thing I want to clarify about the ER visit to St. Luke's Hospital is the following:

- It was initiated by a KU doctor, Dr. Kragenbrink, with whom I was supposed to have an appointment on Monday morning following this incident.
- The visible injuries on my legs were photographed and documented.

- St. Luke's staff called the ED department at KU, afterwards documenting that I had been exposing myself and causing a disturbance in the KU ED. They wrote in my permanent medical record that I "lied" to staff about how I received my injuries and what occurred at KU. This shows the domino effect of harm that was immediately started by the actions of the staff at KU.

IV.    The Criminal Charges

To add clarity to the criminal charges that I was falsely charged with, these are the things I

want to clarify:

- The charges were pressed against me by the KU Police Department at the request of KU staff, specifically Nurse Brodie who explicitly stated on camera that it was because of his perception that I was just being uncooperative.
- I was threatened by KU staff that my career would end if I didn't do as they asked, "Just show up for your court date and explain what happened and I'm sure the charges will be dropped." These words were said verbatim to me by Lane-Tanner and Captain Mahoney.
- I was told by more than one KU representative, one being Lane-Tanner, that they could not drop the charges because it is their company policy to never drop charges due to their "no stated no tolerance policy" for the ER.
- When I challenged this and insisted they do a proper investigation, they tasked Officer Mahoney with the investigation who told me that he didn't see expose myself, but he was going to let it stand because he "wasn't there".
- After this conversation occurred, I discovered through medical records that it appeared I may have lost consciousness. I attempted to take to Lane-Tanner about this new revelation and she cut off communication, sending me a secure that I just needed to request records if I wanted video or any further information.
- I contacted KU's HIPPA compliance officer. I spoke to her on the phone about what happened. I told her that I do not remember them conducting triage on me, so either they didn't conduct triage and it was false information, or they did so while I was unconscious. Either way, I told her I thought there were HIPPA violations that occurred for either falsifying records or not documenting a significant medical event. She agreed that she would watch the video to confirm whether I had lost consciousness and whether they actually conducted triage. But she did not respond to me until right before my court date. She sent a long email saying that she did not check video but checked with the staff to confirm triage was performed and no HIPPA violations occurred and that was the only thing she could help me with. The

email has the feel that a lawyer wrote it instead of her. I have had several interactions with this person and none of them match the voice or tone used in her letter.

- Following receipt of her letter, I showed up in person at the hospital on the day before my court date. I insisted on speaking to Captain Mahoney, who I was always told was not there or unavailable when I called.  Two armed police officers showed up when I arrived and told me that I couldn't speak to Captain Mahoney, but he showed up beside them in the moment of them saying that and sent them away.  He walked me over to a corner and told me "you can't be here". I told him that I discovered we had a bigger problem that I needed his help with.  I told him, "I think I lost consciousness and I think they're covering it up." He said, "Yes, and it has to be adjudicated. You can't be here."  I was told to leave. This is evidence. Not only did he corroborate the cover up, he admitted that he witnesses the incident and confirmed I had lost consciousness. This person has direct knowledge of what happened and is an important witness.

- I made it clear to KU that I was not going to discuss my private medical information in a public forum to beg for false charges to be dropped. When I went for my scheduled court appearance, the judge directed me to have a private conversation with Asst. DA about having the charges dismissed without me having to discuss my medical issues publicly. The Asst. DA told me that she could only dismiss the charges with the recommendation of KU and they had sent her an update just the day before requesting jail time of up to a year.

- I immediately requested counsel since I could not afford a lawyer. This set my case back by more than 90 days.

- Because I needed this to disappear from my record as soon as possible so I could obtain employment as a teacher in Austin., I decided to represent myself after I learned that this would require KU to immediately turn over video and evidence they had been denying me and this would speed the proceedings for the criminal complaint significantly.

- After the Asst. DA received discovery from KU, she called and said that she was not going to follow KU's request for prosecution. She apologized for what happened to me and suggested I drive back to Kansas City to pick up the disks on her desk.


V.      The Process of Seeking Investigations from KU and KUPD

These are the things I wish to clarify:

- I was initially given conflicting information by the representatives at KU concerning their ability to do an investigation. I was told they could not do an investigation because they have a policy to "never drop charges".
- Then, they agreed to have Captain Mahoney conduct an investigation who, upon finding no evidence of a crime said he was going to allow it to stand because he "wasn't there".
- KUPD and KUMC representatives cut off all communication with me upon after I alerted them to the fact that I had, evidently, lost consciousness, preventing me from obtaining any clarity or information about the events of that night.
- My case was escalated to Captain Cowdrey after they cut off my contact with Captain Mahoney. Captain Cowdrey refused to conduct any investigation into my report that I was assaulted by staff while I was in the ED. I have two recorded phone conversations that I plan to submit to the court, if allowed. On the recorded phone conversations, you can hear Captain Cowdrey refuse my request. He told me that he investigated his police staff and found no wrong doing. After I insisted it was the employees that needed to be investigated for harming my body to the point of producing me to become unconscious, he told if I had a problem with the ED, I

would need to contact the hospital. He had no sympathy when I told him that they would not talk to me. I think he already knew. During these recorded phone conversations, Captain Cowdrey refuses to discuss any of my concerns about possible criminal events. He told me that I was not assaulted. I asked him if he saw the video of me becoming unconscious and he refused to answer. I said, "Then tell me HOW I became unconscious." He said, "I don't know. I'm not a doctor." I said, "What does that mean? Does that mean you think you saw me go unconscious, but you're not sure?" I insisted he told me what he saw, but he would only repeat, "I don't know. I'm not a doctor."

VI.    The Process of Seeking my official Medical Record Set

I have had to educate myself about a lot of things I had no knowledge of before. I gained knowledge about my official "Medical Record Set" obtained by KU that contains much more information that they short print out of the discharge papers I was given for the event in question. I decided to officially request my official Medical Record Set from KU, but every request has been denied. They claim that they have released all of my Designated Record Set that they are required to by law. Beyond this, they refused to give a reason for not providing the information requested. I am not sure if this is true, but I believe I read that

they can claim something called "legal privilege" to withhold certain information. The information these records hold are crucial to proving the events of May 7th and 8th which would allow me to demand my medical records be corrected, which is why I need the court's intervention to get this accomplished. HIPPA law states that a person's Designated Record Set includes any video "used to make decisions about the individual". The video was used by Captains Mahoney and Cowdrey. KU representatives refuse to engage me in conversation about who has seen the video and why it is not included in my Designated Record Set.

VII.    The Process of FOI Requests sent to KU and Entities

After my attempts at acquiring the video and any other information related to the events at KUED had failed, I sent formal FOI requests to KU. They demanded exorbitant amounts of money before they would release the information requested. I cannot afford to pay any of it. One letter demanded over $7000 before they would release any of the information requested concerning my care at their facility.

KU has this important evidence, but it will require the court to compel them to reveal the video and documents that show this information.

VIII.    Who Did What

I am not a lawyer and am not educated enough to be able to present this is a manner that the court may desire, but the information of who did what is explained either in my complaint or the other supplemental information I am providing here. But for clarity, I am providing the chart below.

Because the KU Hospital Authority and its subsidiaries has such a complicated legal structure, it has been difficult to ascertain which KU organization directly is over which employee, What I do for sure is all of the facilities and employees, including KUPD, fall under the umbrella of KU Hospital Authority, which makes them liable.

I recognize that KU Medical Center may be able to claim sovereign immunity but the Hospital Authority cannot and can therefore be sued.

But also, KU Medical Center can be sued under the 1983 statute because my constitutional rights were. From what I understand using the help of ChatGPT, this is the principal statute

used to sue state actors for things like unconstitutional use of force, denial of due process, or deliberate indifference to serious medical needs. All things that I experienced. This may only apply to suing them in an individual capacity, but this should be something decided by the court as more information is obtained. Even I don't understand the full extent of who is responsible for what because KU is still holding my records hostage.

The purposeful efforts to keep the records a secret and refusal to investigate or release information, including video, are egregious and must be remedied by the court. I have exhausted all known possibilities to obtain this information myself. This purposeful withholding of my medical records violates both federal HIPAA laws and Kansas statutes 65-6824 and 65-6836 (per Chat GPT), which expressly allows a claim or action to enforce this law. The federal court can do this and so listing KUMC as a defendant is proper.

KU Police Department is also proper to list as a defendant. Individual police officers can be listed as dependents, which I noted on my complaint. I have recently learned about Monell liability. Under Monell, KUPD or whoever oversees them is can be sued when an official policy or widespread practice caused the harm.

It appears to me that KUPD do not act as independent police department as they claim, but have policies in place in conjunction with KUMC and/or KUHA that serve to protect each other. Their claims that it is their policy to "never" drop charges against someone, even when an investigation contrary to the charge, violates due process. Their claim that they could not drop charges due to their "no tolerance" policy is a misuse of their stated policy which addresses violence staff in the Emergency Department, something I did not exhibit and was not accused of. The misuse of this policy is strong evidence that they are properly listed as a defendant.

| Who | Employer | Did What |
|---|---|---|
| Arevalo Brian Gutierrez, pol officer | KUPD | Failure to act when I was in obvious medical crisis; denied me due process and cited me for false criminal actions that did not occur |
| Zachary Dylan Cronk police officer | KUPD | Failure to act when I was in obvious medical crisis |

| | | |
|---|---|---|
| Jessica White, police office | KUPD | Failure to act when I was in obvious medical crisis |
| Jeffrey A Cowdrey, | KUPD | |

| police captain | | Denied me due process. Refused to open an investigation into possible assault on my body. Refused to open an investigation to explain my loss of consciousness, which I believed occurred from assault. |
| --- | --- | --- |
| William Mahoney, police captain | KUPD | Denied me due process. Refused to drop charges despite his findings of my innocence after investigating. Either used an improper policy or misused KUPD policy as a reason to refuse dropping of charges. |
| Cierra De'aoun France | KUMC | Assault. I do not remember her directly assaulting me, but she directed my body to be dumped on the floor (which it was) and this caused further injury just 11 days following my major surgery. Failure to act when I was in obvious medical crisis. Repeatedly refused to provide assistance to the restroom or send medical help to the restroom during this medical event. Making false reports to police officers. |
| John Doe (W/M) Brown Hair, Clean cut haircut, clean shaven | KUMC | Assault. I clearly remember him hitting me in the stomach to force my body into a L sitting shape that my body could not endure so soon following such a major surgery. KU Health Systems seem to have gone to extraordinary lengths to hide this mystery person from my records, but his image has been seered into my brain since the event happened. I have identified him from a promotional video published by the KU Emergency Department. I possess this video and a still image of him.  In addition, KU possesses video of him and his assault on my body.  I beg the court to compel KUMC to identify this person so that he can be properly named and served. |

| Zimmerman, Sarah, RN | KUMC | Failure to act when I was in obvious medical crisis; entered falsified medical information; Because I lost consciousness, I have no way of knowing the extent of her involvement when this happened. This is the nurse that conducted triage on me while I was unconscious and also failed to document this medical event. |
|---|---|---|
| Broddle, Samuel, RN | KUMC | Failure to act when I was in obvious medical crisis; entered falsified medical information; directed KUPD to press criminal charges against me, while simultaneously admitted that he didn't see any crime committed. |
| STEVE STITES, M.D | KUMC | Improperly supervised staff that committed the offenses described. |

Their actions against me should prick the conscious of the court. I was alone and had no one to accompany me to act as an advocate. I was completely dependent on KUMC and KUPD to care and protect me as you would expect anyone who arrives by ambulance alone. These offenses have to be answered, as it has great implications for the public that continue to seek care at their facilities.

IX.     RESULTING HARM

In August, 2024, I entered a psychiatric facility due to increased PTSD symptoms resulting in flashbacks from the KU incident and suicidal ideation. Dr. Kragenbrink helped find me a facility here in Austin. I continued to see her from Austin, via telehealth, until August, 2024. I told the facility what happened to me at KU. Recognizing how unbelievable it sounds, I begged them to call and speak to Dr. Monica Kragenbrink, who was a central figure in calling emergency services to my resident for a second time, resulting in a second ambulance taking me to a second medical ER following the KU event.

I signed permission for this psychiatric facility to request my medical records and then communicate with Dr. Kragenbrink to confirm what I was saying. Except they didn't speak to Dr. Kragenbrink. They requested my records from KU and accepted the falsified records as fact. So when I began having abdominal pain requiring medical attention, they treated me as a histrionic and did not believe I was having an actual medical issue. When my condition advanced and the pain became so unbearable that I required emergency medical care, it was ignored. My requests to call 911 from refused. I was told I had to wait

until "patient phone time" and then I could call who I wanted, including 911.  During patient phone time, I called 911. Medical responders put me on hold in order to communicate with the psychiatric facility where I was admitted and subsequently refused to send medical responders. I had to call 911 repeatedly and beg the staff at the psychiatric hospital to do something. This domino effect of misinformation in my medical record from KU resulted in emergency services being delayed and I nearly died of abdominal sepsis. Emergency medical staff had to perform emergency surgery. I was cut open vertically almost a foot and a half down the middle of my abdomen. Days later I woke up suffering from vivid and frightening hallucinations, including thinking I was in KU at Kansas City and that the medical staff were trying to hurt me instead of help me.

The psychiatric department of the hospital became involved.  She explained that the sepsis had become so severe that it was causing these hallucinations. She called and spoke to Dr. Kragenbrink at KU who confirmed what happened. The hospital immediately backed down from certain actions they exploring, including seeking guardianship or involuntary commitment. They administered a psychiatric medication for a few days to decrease hallucinations and assured me they would decrease as the sepsis in my body decreased, which they did. Ultimately, I was hospitalized for over 20 days and bedbound at home for many months requiring daily home health visits. I was forced to resign from both of my teaching positions at a local public school and the local community college. I lost all means to work and bring in income. I lost my health insurance, was unable to pay for any living expenses, including basic needs like food. I came to the brink of being homeless again until I was approved for permanent disability.

The reasons for my delay in receiving medical care can be traced directly to my medical records from KU hospital.  These records continue to permeate my permanent medical records throughout the area where I live. They are accepted as fact and will continue to be accepted as fact until proven otherwise. Not every hospital will be able or willing to call and speak to Dr. Kragenbrink or other medical staff with direct knowledge of the event to contradict what my medical record states.

I exhausted all means of Requesting in coursing coercing KU 2 amend my medical record. Petitioning the court is a last resort to publicly state what happened enforce Kaiju to reveal the truth about what happened during this event including a record of me becoming unconscience and the circumstances surrounding how that happened I beg the court to compel KU to release all of my medical records that I have been requesting and they have been refusing to give including the video evidence they still obtain. I beg the court to require KU to correct my medical the false inflammatory information that portrays me as somebody I am not.

I acknowledge that the events I describe involving the University of Kansas entities may seem implausible, and that, had they not happened to me personally, I might find them difficult to believe as well. I further recognize that the factual and legal relationships among the various components of the KU Health Authority are complex, and I may not have perfectly identified which specific entity is responsible for which acts. Even so, I respectfully ask the Court to consider the seriousness and complexity of this matter and allow it to proceed. I understand the Court's obligation to prevent frivolous litigation from burdening the judicial system, but I have substantial evidence that I can submit to demonstrate that my claims are well-founded and that they raise significant public concerns, particularly because these facilities are public institutions.

X.     HISTORICAL HARM

I have always been interested in genealogy and studying people and events of the past. I was recently able to trace my ancestors all to the way back to the founding of our Constitution, the very document that cemented my rights as a person and as an American that I am trying to protect. After researching our Patriot ancestors, I can tell you that historical accuracy is vital.  Historical harm is just as important to prevent as current harm. If this harm is not corrected, this "story" and the inaccurate records that accompany it, including the false criminal charges, will stand for eternity. The reputational harm done will extend well beyond my death.


REQUEST FOR PERMISSION TO SUBMIT VIDEO AND AUDIO FILES CONVENTIONALLY

From what I understand, I cannot submit exhibits to the court without prior approval. I believe the court granted me permission to submit the files conventionally, but I was unsure if that was canceled after I had to resubmit my complaint using my real name. I called the court clerk to ask for clarification, and they would not clarify the court's ruling or advise me in anyway, which I know they are not allowed to do. They could tell me if I had a deadline to submit the files. Before I had to chance to submit anything, the court submitted their denial of counsel and response, to which I am responding.

Please clarify if I still have permission to submit this evidence to the court, along with the paper documents that I obtain as evidence.


I, Karen Overtreet beg the court to hear my plea and do not let these injustices go unanswered.  I have done everything I know to do without getting the courts involved.

I beg the court to withdraw its recommendation for dismissal and/or allow me to amend my complaint to meet the court's standards. Please do not dismiss my complaint on a technicality without being provided the opportunity rectify as missteps I may have as a pro se litigant.

I further beg the court to reconsider my request for counsel, even if it is in just a limited capacity.

*Executed this 11th day of March, 2026.*
*Respectfully Submitted,*
*Karen Overstreet, Pro Se Plaintiff*

*Karen Overstreet*

*Email: dltbgyd.ku.lawsuit@gmail.com*
*Ph: (512) 649-8723*
*3575 Far West Blvd. P.O.*
*Box 26362*
*Austin, TX 78755*